IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIMBERLY-CLARK WORLDWIDE, INC.,   :

                    Plaintiff                 :

                    vs.                  :   CIVIL NO. 1:CV-09-1685

                                            :

FIRST QUALITY BABY PRODUCTS, LLC,
FIRST QUALITY PRODUCTS, INC.,     :
FIRST QUALITY RETAIL SERVICES, LLC,
FIRST QUALITY HYGIENIC, INC.,      :
                Defendants and
                Counterclaim Plaintiffs    :

                    vs.                  :

KIMBERLY-CLARK CORPORATION,   :
KIMBERLY-CLARK WORLDWIDE, INC.,
KIMBERLY-CLARK GLOBAL SALES, LLC,:
                Counterclaim Defendants


*M E M O R A N D U M*

*I.*         *Introduction*

        Presently before the court are the defendants' and plaintiff's proposed construction of the disputed claim terms in this patent infringement action.  Based on the following, we will enter an order pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384 (1996).


*II.*        *Background*

        This action encompasses eleven patents-in-suit related to disposable absorbent products such as infant and adult diapers.  The claim terms at issue are found in KC's U.S. Patent Nos. 5,286,543 (the "Ungpiyakul Patent"); 6,702,798 (the "Christoffel Patent"); 5,745,922 to Rajala et al., 6,098,203 to Rajala et al., 6,260,211 to Rajala et al.,

7,000,260 to Rajala et al. (collectively the "Rajala Patents"); 5,940,887 to Rajala et al.;

5,147,343 (the "Kellenberger Patent"); and 5,601,542 (the "Melius Patent"); 5,154,902 to

Pieper et al.; and 5,496,298 (the "Kuepper Patent").

        This controversy originally began in February 2009 when defendants filed a

complaint in this court seeking declaratory judgment of invalidity and noninfringment of

the Kuepper Patent.  *See First Quality Baby Prods., LLC v. Kimberly-Clark Worldwide,*

*Inc.*, Case No. 09-354.  KC moved for dismissal arguing that we lacked subject matter

jurisdiction.  We agreed and dismissed the case.  *See First Quality Baby Prods., LLC v.*

*Kimberly-Clark Worldwide, Inc.*, No. 09-0354, 2009 WL 1675088 (M.D. Pa. June 15,

2009).  Prior to our dismissal, however, KC filed a patent infringement action in the

United States District Court for the Northern District of Texas.  On August 31, 2009, KC's

infringement action was transferred to this court.  Subsequently on June 9, 2010, we held

a claim construction hearing where both parties set forth their positions on the proper

interpretation for the disputed claim terms.  Based on the parties arguments and our

independent review of the record, we will now address each of the disputed claim terms.[1]


III.        *Discussion*

        *A.  General Principles*

        Claim construction is a matter of law.  *Markman v. Westview Instruments,*

*Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)(en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384

(1996).  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the

---

[1]  We previously construed the disputed claim terms of the Kuepper Patent in our July
29, 2010 memorandum and order denying First Quality's motion for summary judgment.
*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, - - -F.Supp.2d- - - -, 2010
WL 3024863 (M.D. Pa. 2010).  Likewise, the parties have agreed on the construction of the
single claim term at issue in the Pieper Patent.  Furthermore, certain claims terms of the
Kellenberger and Melius Patents are the subject of a pending summary judgment motion
before the court.  Thus, we only address those claim terms that are not the subject of that
motion.

invention to which a patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005)(quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The words of a claim are generally given their "ordinary and customary meaning."  *Id.* (quoted case omitted).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art...at the time of the invention."  *Id.* at 1313.  We determine this meaning primarily through intrinsic evidence, i.e. the claim language, the specification and the prosecution history.  *See Power-One, Inc. v. Artesyn Technologies, Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010); *see also Phillips,* 415 F.3d at 1312-17 (defining intrinsic evidence); *Arlington Indus., Inc. V. Bridgeport Fittings, Inc.*, No. 01-0485, 2008 WL 542966, at *1 (M.D. Pa. Feb. 25, 2008).  We may also consider extrinsic evidence, such as dictionaries, treatises, and expert testimony, to shed light on claim construction, but such evidence "is less significant than the intrinsic record" and "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  *Phillips*, 415 F.3d at 1317-19.

    In some instances, the ordinary meaning of claim language "as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction...involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  A patentee, however, "may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Thus, it is necessary for a court to review the specification to determine whether a patentee has used any terms in a manner different from their ordinary meaning.  *Id.*  Nonetheless, a court must avoid the danger of importing limitations from the specification

into the claim.  *Phillips*, 415 F.3d at 1323.  "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if [a] court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."  *Id.*   Although a specification may describe certain embodiments of an invention, the Federal Circuit cautions against confining the claims to those embodiments.  *Id.*  Nevertheless, the Federal Circuit makes clear that if a claim term is construed in a manner that would render the preferred embodiment outside the scope of the patent claim such an interpretation would "rarely, if ever," be correct and would "require highly persuasive evidentiary support."  *Vitronics*, 90 F.3d at 1583. Likewise, claims cannot "enlarge what is patented beyond what the inventor has described as the invention."  *Abbott Lab. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009)(citations omitted).

B.  *Ungpiyakul Patent*

The Ungpiyakul Patent is directed towards an absorbent article containing certain registered graphics.  The patent discloses an article having certain layers of material including a patch of web material.  This patch is secured to the backsheet of an article and contains graphics of a non-random design.  The patch also contains a "reference marker" that allows manufacturing equipment to determine where to cut each patch so that it may be attached to an absorbent article.

1.  "backsheet layer"

First Quality argues that the phrase "backsheet layer" found in Claim 1 of this patent means "a layer of material which substantially blocks the passage of liquid." (doc. 168 at 25.)  In contrast, KC proposes that we construe the phrase to mean "a layer of the outer cover."  (doc. 150 at 45.)  In arguing for its construction, First Quality relies on the specification and expert testimony.  It contends that the specification shows that "backsheet" and "backsheet layer" are used interchangeably, and indicates that said layer is substantially liquid impermeable.  (doc. 168 at 25-27.)  First, we must determine whether the intrinsic evidence supports First Quality's argument that "backsheet" and "backsheet layer" are used interchangeably in the patent.  Then, we will determine whether the evidence supports KC or First Quality's construction.

We conclude the evidence supports First Quality's contention that "backsheet" and "backsheet layer" are used interchangeably in the patent.  Claim 1 states that one part of a finished article is "a backsheet layer."  U.S. Patent No. 5,286,543, Claim 1.  The specification further provides, referencing Figure 3A, that the "article generally includes a *backsheet layer* **236**, and a substantially liquid permeably topsheet layer **239** which is disposed in an adjacent facing relation with the backsheet layer."  *Id.* at col.6, ll.10-14 (emphasis added).  The specification



FIG. 3A

continues stating "[i]n the shown embodiment, the topsheet and *backsheet* are substantially coextensive and relatively larger than the absorbent pad."  *Id.* at col.6, ll.15-17.  Indeed, a "*[b]acksheet* **236** typically comprises a substantially liquid impermeable

5

polymer film, such as a polyethylene film." *Id.* at col. 6, ll.61-63 (emphasis added).  In addition, the specification includes numerous other references where "backsheet **236**" is in place of "backsheet layer."  Based on the preceding, we are compelled to conclude that "backsheet" and "backsheet layer" are interchangeable in the Ungpiyakul patent.

In support of its proposed construction, First Quality relies on two embodiments described in the specification.  In one embodiment, the specification, as previously cited, provides that a "[b]acksheet **236** typically comprises a substantially liquid impermeable polymer film, such as polyethylene film" and that "the backsheet may comprise a non-woven material which has been imparted with a desired level of liquid impermeability."  U.S. Patent No. 5,286,543 at col.6, ll. 61-63; col.6, ll. 68-col.7, ll.1-2.  In another embodiment indicated in Figure 3, the specifications states that "substrate **36** is a moving layer composed of a substantially liquid impermeable backsheet material, such as polyolefin film layer." *Id.* at col.5, ll.59-63.  In contrast, KC principally relies on what it believes is a distinction between backsheet and backsheet layer.  As we have indicated, we are not persuaded by KC's argument.  Instead, we agree with First Quality's contention that the proposed limitation is supported by the claim language and the specification.  Nevertheless, we believe that First Quality's construction fails to closely adhere to the language of the specification, which is readily understandable.  Thus, we conclude that the intrinsic evidence neither supports First Quality nor KC's construction of the disputed claim term.  We believe a person of ordinary skill in the art based on the claim language and the specification would understand "backsheet layer" to mean  "a layer of substantially liquid impermeable material."  Therefore, we will construe "backsheet layer" to mean "a layer of substantially liquid impermeable material."

<u>2. "a relatively smaller patch of web material"</u>

First Quality argues that "a relatively smaller patch of web material" found in Claim 1 of the Ungpiyakul Patent should be construed to mean "a piece of material that is smaller than the absorbent pad, topsheet layer, and backsheet layer." KC offers that the phrase means "a piece of material that is at least somewhat smaller than the backsheet layer."

After review, we find that the intrinsic evidence supports KC's proposed construction. The specification provides, in relevant part:

> The article generally includes a backsheet layer **236**, and a substantially liquid permeable topsheet layer **239** which is disposed in an adjacent facing relation with the backsheet layer. An absorbent pad **54** is sandwiched between the topsheet and backsheet layers...Accordingly, marginal portions of the topsheet and backsheet extend beyond the periphery of the absorbent pad to form front and rear waistband edges and lateral side edges. *A relatively smaller patch of web material **228** is secured to an inward or outward facing surface of the backsheet layer.*

U.S. Patent No. 5,286,543 at col.6, ll. 10-23 (emphasis added). Likewise, Claim 1 specifies that "[a]n article comprising: a backsheet layer; a substantially liquid permeable topsheet layer...An absorbent pad sandwiched between said topsheet and backsheet layers; and a relatively smaller patch of web material secured to an inward or outward facing surface of the said backsheet." U.S. Patent No. 5,286,543, Claim 1. Each of these pieces of evidence indicate that a small patch of web material must be attached to the inward or outward facing surfaces of the backsheet. It follows that in order to be attached to the backsheet the web material must be smaller than said backsheet. Furthermore, the only term appearing in the same clause as a "relatively smaller patch of web material" is the word "backsheet." This indicates that the web material must be relatively smaller than the backsheet in order to be attached to said backsheet. Contrary to First Quality's argument, KC's construction does not impermissibly expand nor limit the

7

scope of the patent.  Instead, KC's construction is supported by the claim and
specification language.  Therefore, we conclude that "a relatively smaller patch of web
material" means "a piece of material that is at least somewhat smaller than the backsheet
layer."

### C.  Christoffel Patent

The Christoffel Patent discloses an absorbent article that is folded in a
particular manner that reduces folding of the absorbent core in order to minimize leakage.

#### 1.  "a demarcation line"

The phrase "a demarcation line" is used in Claims 1 and 10 of the
Christoffel Patent.  KC contends that this language should be interpreted to mean "a
transverse fold line positioned off the absorbent core."  (doc. 150 at 29-30.)  KC claims its
construction is supported by the patent specification, which teaches "that the demarcation
line is (1) a transverse fold line that is (2) positioned off the absorbent core."  (doc. 150 at
30.)  The specification provides that:

> a folded absorbent article has been developed that has the
> desired rectangular shape but is transversely folded in a
> portion of the absorbent article spaced away from the
> longitudinal edges of the absorbent core.  Folding the
> absorbent article at a transverse demarcation line positioned
> away from the longitudinal edges of the absorbent core
> eliminates transverse folding of the absorbent core and can
> improve the effectiveness, fit and comfort of the absorbent
> article in use by the consumer.

U.S. Patent No. 6,702,798 B2 col. 1 l.40-48.

First Quality argues that KC's proposed construction impermissibly imports
a limitation from the specification into the claims.  (doc. 168 at 81.)  In addition, First
Quality contends that KC's construction is contradicted by Claim 15.  Specifically, it
asserts that Claim 15 requires that "the front edge of the absorbent core 'abut' the

demarcation line"; however, "it is impossible for the demarcation line to be 'positioned off the absorbent core' and 'touch' the absorbent core at the same time." (doc. 168 at 81.)[2]

We will construe "a demarcation line" to mean "a transverse fold line positioned off the absorbent core." This construction is supported by the claim language and the specification. The demarcation line is described in the claims as being between the first and second zones of the back and front portions of the article. U.S. Patent No. 6,702,798 B2, Claim 1 & 10. Figures 1 and 2 illustrate that the demarcation line is a transverse line that is positioned away from the absorbent core. *See Id.* Figs. 1 & 2. In addition, the language found in the background section of the specification teaches that the demarcation line is "positioned away from the...edges of the absorbent core." *Id.* at col. 1 ll.44-46. This language makes clear that the demarcation line must be positioned off the absorbent core. This construction also does not contradict Claim 15. Claim 15 provides that "[t]he absorbent article of claim 10 wherein said front edge of said absorbent core abuts said demarcation line in said front portion." U.S. Patent No. 6,702,798 B2, Claim 15. This Claim indicates only that the demarcation line "abuts" or "touches" the front edge of the absorbent core, as illustrated by Figure 3, but does not fold on or cross the absorbent core. Therefore, contrary to First Quality's assertions, the specification and claim language support KC's construction. Accordingly, we will construe "a demarcation line" to mean "a transverse fold line positioned off the absorbent core."

2.  "an absorbent core"

KC contends that the term "an absorbent core" found in Claims 1, 6, 8, and 10 means "a portion of the absorbent article containing a liquid permeable cover, a liquid

---

[2] The parties agree that the word "abuts" found in Claim 15 means "touches". (docs. 168 at 81; 197 at 20; and 232-2 at 7.)

permeable baffle, and an absorbent layer therebetween, having not more than one

transverse fold line." (doc. 150 at 32-33.) First Quality agrees with most of KC's

construction except for the phrase "having not more than one transverse fold line." First

Quality argues this additional language "impermissibly attempts to read-in additional

limitations from the stated 'object' of the invention." (doc. 168 at 84.)

In support of its construction, KC cites to the specification which provides, in

relevant part, that the absorbent core "includes a liquid permeable cover, a liquid

impermeable baffle, and an absorbent layer positioned therebetween." U.S. Patent No.

6,702,798 B2, col. 4, ll. 38-41. In addition, the specification explains that when the

absorbent article is transversely folded along the demarcation line "the absorbent core

will contain only one transverse fold line located approximately along transverse

centerline Y-Y thereby minimizing the chance of fluid leakage." U.S. Patent No.

6,702,798 B2, col. 11, ll. 51-55.

Here, the evidence support's First Quality's construction. The pertinent

specification language KC relies on to support its construction only encompasses one

embodiment of the invention. The specification clearly states that "[w]hen the absorbent

article is folded in *this* manner, the absorbent core will contain only one transverse fold

line." *Id.* at col. 11, ll. 51-53 (emphasis added). This language indicates that only when

the article is folded in this specific fashion will the absorbent core have only one

transverse fold line. KC's proposed claim construction also conflicts with the previously

cited section of the specification which provides that the purpose of folding the article at

the demarcation line was to eliminate transverse folding of the absorbent core. *See Id.* at

col. 1, ll. 40-48. Indeed, the specification readily supports First Quality's construction by

clearly providing that the absorbent core "includes a liquid permeable cover, a liquid

impermeable baffle, and an absorbent layer positioned therebetween." U.S. Patent No.

6,702,798 B2, col. 4, ll. 38-41.  Thus, we conclude that the claim language and the specification supports First Quality's proposed claim construction.  Therefore, we will construe the term "an absorbent core" found in Claims 1, 6, 8, and 10 to mean "a portion of the absorbent article containing a liquid permeable cover, a liquid permeable baffle, and an absorbent layer therebetween."

### D.  The Rajala Patents

The Rajala Patents relate to the construction of a disposable absorbent garment.  More specifically, the patents claim a system of elastics of different configurations designed to reduce leakage.  Below are the disputed claim terms of the Rajala Patents.

#### 1.  "garment blank subassembly"

First Quality argues that the phrase "garment blank subassembly" found in Claims 1-5, 7-8, 11-14, 16-18, 20-21, and 26 of U.S. Patent No. 5,745,922; Claims 1, 2, 9, and 16 of U.S. Patent No. 6,098,203; Claims 1-7 of U.S. Patent No. 6,260,211; and Claims 19-22 and 24 of U.S. Patent No. 7,000,260 means "a precursor of a garment not including an absorbent."  (doc. 168 at pgs. 69-70.)  KC contends, however, that the phrase means a "precursor element of an unfinished article."  (doc. 150 at pg. 7.)  In essence, both parties agree that a garment blank subassembly is not a finished product, but rather a precursor to a finished garment.

This dispute centers on the phrase "not including an absorbent", which First Quality claims is supported by the specification, claim language, and prosecution history. Specifically, defendants argue that the claim and specification language teach that the final product, described as a disposable garment, has an absorbent component.  Being that a "garment blank subassembly" is a precursor of a finished product, it follows that a garment blank subassembly must not contain an absorbent.  (doc. 168 at pg. 71.)  In

11

addition, First Quality claims that during the course of prosecution the PTO issued a restriction requirement where it allegedly found that garment blank subassemblies belonged to a class of goods that could be used as "nonabsorbent pair of shorts."  (doc. 168 at pg. 71.)

In contrast, KC argues, and we agree, that First Quality seeks to add a negative limitation into a claim term that is not supported by the intrinsic evidence.  First, as the Eastern District of Texas illustrated, restriction requirements are generally considered an administrative tool for the PTO, and are typically afforded little weight against unambiguous claim and specification language.  *Colorquick, LLC v. Eastman Kodak, Co.*, No. 06-390, 2008 WL 5771324, at *8 (E.D. Tex. June 25, 2008)(collecting cases on restriction requirements).  Furthermore, the restriction requirement in question concerns elastics, not absorbents.  Therefore, we find the restriction requirement uninformative.  We also are unpersuaded by First Quality's argument that since a finished disposable garment has an absorbent it follows that the garment blank subassembly must not have an absorbent component.  This reasoning seeks to add a negative limitation that we conclude is not supported by the evidence.  However, we disagree with KC's proposed construction that a "garment blank subassembly" is a "precursor element of an unfinished article."  The specification states that "a garment blank subassembly...is a type of precursor of the garment."  U.S. Patent No. 5,745,922, col. 1, ll. 64-65; U.S. Patent No. 6,098,203, col. 2, ll. 1-2.  This definition of the disputed term is unambiguous and is supported by the intrinsic evidence.  Thus, we will construe "garment blank subassembly" to mean "a precursor of the garment."

2.  "first layer" and "second layer"

"[F]irst Layer" found in Claims 1, 5, 16, and 18 of U.S. Patent No. 5,745,922; Claims 1, 2, 9, and 16 of U.S. Patent No. 6,098,203; Claims 1 and 5 of U.S.

Patent No. 6,260,211; and Claims 19, 20, 26, and 27 of U.S. Patent No. 7,000,260, and "second layer" found in Claims 4, 5, 7, 17, 18 and 20 of U.S. Patent No. 5,745,922; Claims 1 and 2 of U.S. Patent No. 6,098,203; and Claims 19, 20, 26, and 27 of U.S. Patent No. 7,000,260 are both in dispute.  KC argues "first layer" and "second layer" should be construed to mean "first operative layer" and "second layer that may or may not be a contiguous," respectively.  In response, First Quality proposes they be given their ordinary and customary meaning.

After review, we agree with KC's construction of "first layer", but decline to adopt KC's proposed construction for "second layer."  First, the specification teaches that the "first layer" is an "operative layer, generally extending functionally from the first edge through the crotch to the second edge." U.S. Patent No. 5,745,922, col. 2, ll. 24-27.  Furthermore, the language of Claim 1 instructs that a "garment blank subassembly" is comprised of  "a first layer, extending from the first end through the crotch to the second end." U.S. Patent No. 5,745,922, col. 16, ll. 19-21.  When viewed as a whole, the above language indicates that a "first operative layer" is synonymous with a "first layer," and thus a "first layer" must be a "first operative layer."  This construction of the claim term does not import a limitation into the claim language that is not supported by the intrinsic evidence nor does it alter the meaning of the word "layer".  Instead, it gives the claim term the meaning that the term would have to a person of ordinary skill in the art.  In contrast, KC's proposed construction for "second layer" seeks to add a limitation that is not supported by the specification or claim language.  As the specification makes clear, "'an unsecured space' *may* include an area where the front layer element and the back layer element of the second layer *may or may not be contiguous.*"  U.S. Patent No. 5,745,922, col. 2, ll. 60-62 (emphasis added).  This permissive language, on which KC relies, only indicates that an "unsecured space" could include areas of the front and back

layer elements that may or may not be contiguous.  The above language does not

support the construction that a "second layer" itself may or may not be contiguous.

Based on this reasoning, we decline to adopt KC's construction of "second layer," and

thus will give it its ordinary and customary meaning.  We therefore conclude that "first

layer" and "second layer" mean a "first operative layer" and a "second layer", respectively.

### 3.  "a...section of...elastic across the crotch"

Throughout the claim terms of the Rajala patents, the phrases

"a...section...of elastic across the crotch" and "extensible across the crotch" appear in

multiple permutations, i.e. "a second section of the first elastic...across the crotch."  U.S.

Patent No. 7,000,260, col. 20, ll. 63-65.  This claim dispute centers on the phrase "across

the crotch."  First Quality contends it should be given its ordinary and customary

meaning, and thus needs no construction since it is readily understandable.  (doc. 168 at

pg. 73-75.)  KC counters essentially arguing that "across the crotch" means "generally at

the crotch."  (doc. 150 at pgs. 14-15.)  KC asserts that if we were to adopt First Quality's

construction the effect would be to create a nonsensical result and "exclude entirely one

of the embodiments from patent protection," because said embodiment shows parts of

the elastic to be severed.  (doc. 197 at pg. 16-17)

After review, we disagree with KC's interpretation of the Rajala patents'

language.  First, the claim and specification language support First quality's construction

of the claim terms.  The claim terms clearly provide that "a section of...elastic across the

crotch," or some variation thereof, is integral to the construction of the object.  *See* U.S.

Patent No. 5,745,922, col. 16, ll. 28-29; U.S. Patent No. 6,098,203, col. 17, ll. 46-47.

This language unambiguously means to one of ordinary skill in art that, for these claim

terms, the elastic goes across the crotch.  Second, by adopting First Quality's

construction, we are not excluding an embodiment from patent protection.  Without ruling

14

on claims not at issue, we observe that Claims 12, 25, and 26 of U.S. Patent No. 5,745,922; Claim 22 of U.S. Patent No. 6,098,203; Claim 9 of U.S. Patent 6,260,211; and Claim 22 of U.S. Patent No. 7,000,260 recite that the first and second elastics have been cut or severed.  As noted by the Federal Circuit, "[i]t is often the case that different claims are directed to and cover different disclosed embodiments." *Helmsderfer v. Bobrick Washroom Equipment, Inc.,* 527 F.3d 1379, 1383 (Fed. Cir. 2008).  Thus, by adopting First Quality's construction of the disputed claim term, this does not mean an embodiment of the patent is excluded from the scope of the invention, "but rather that [it is] excluded from the scope of [this] particular [claim]." *Id.*; *see also*  Thus, based on the above reasoning, the claim terms "a...section of...elastic across the crotch" and "extensible across the crotch" mean "a...section of...elastic across the crotch" and "extensible across the crotch," respectively.

4.  Rajala Patent No. 5,940,887 – "intersect"

Rajala Patent '887 relates to disposable absorbent garments where the leg and crotch elastics are configured in manner that minimizes leakage and improves fit. For the disputed claim term found in Claims 1, 14, 19 and 20, KC and First Quality both agree that "intersect" means "cross over or overlapping."  The dispute centers on First Quality's addition of the phrase "within a common layer."  First Quality contends that its proposal is consistent with the ordinary meaning of the word "intersect."  (doc. 168 at pg. 77.)  KC counters insisting that First Quality is attempting to insert a limitation that is not supported by the intrinsic evidence.  (*See* doc. 197 at pg. 18.)  After review, we agree with KC.

First Quality's bases its construction not on the intrinsic evidence, but rather on the usage of the word "intersect."  Defendants argue that in ordinary usage, "one would not describe a corridor on the second floor as intersecting with a corridor on the

third floor, even if the third floor corridor 'crosses over' the second floor."  (doc. 168 at pg. 77.)  This is true.  However, by agreeing that "intersect" means to "cross over or overlap", First Quality is implicitly refuting the common usage of "intersect", which is typically defined as "to pierce or divide by passing through or across."  Webster's Third New International Dictionary (unabridged) 1182 (1981).  More importantly, neither the claim nor specification language provide that the elastics must be within a common layer.  By adding this language, First Quality seeks to add a limitation into a claim that is not supported by the evidence.  Since the parties agree that "intersect" means "cross over or overlapping", we will construe the term as such.

                *E.  Kellenberger Patent - "can", "has"*

         The Kellenberger Patent concerns an absorbent composite or core for an absorbent article.  More specifically, the absorbent composite consists of a matrix of fibers and superabsorbent material that is designed to absorb fluids, but dramatically reduce the thickness and weight of an absorbent article.

         Here, we are asked to construe two commonly used verbs, "can" and "has".  KC suggests that "can" and "has" should be given their common usage definition, "capable of" and "possesses", respectively.  (doc. 150 at pg. 64.)  In contrast, First Quality proposes that we construe "can" and "has" to mean "the superabsorbent material is 'specifically selected based on its having the' claimed properties."  (doc. 168 at pg. 34.)  Essentially, First Quality argues that we should construe said verbs to mean "selected".  In support of its construction, First Quality cites to portions of the prosecution history it alleges indicate that KC intended "can" and "has" to have an "unconventional meaning."  (doc. 168 at pg. 38.)  KC denies First Quality's characterization of the prosecution history, and also argues that First Quality is improperly trying to include a method step or intent into the patent claims.  (doc. 197 at pgs. 32-40.)  We agree.

By seeking to construe "can" and "has" to mean "selected", First Quality improperly seeks to add a process limitation into an apparatus claim. *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008)(citations omitted)("Courts must generally take care to avoid reading process limitations into an apparatus claim...because the process by which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim.").  "Selected" assumes a process or method of selection.  Here, Claims 1, 20, 30, 41 and 42 are apparatus claims.  They have no process limitations.  The claims do not represent an intention to patent a method or process of selection.  Instead, these claims indicate the patentees intention of patenting an apparatus that has specific superabsorbent properties.  Furthermore, we find nothing in the specification, claims or patent history that would indicate that KC intended to give "can" and "has" unconventional, special definitions.  Based on this reasoning, we conclude that "can" and "has" will be given their ordinary meaning.  Thus, "can" and "has" mean "capable of" and "possesses", respectively.

### F.  Melius Patent

The Melius Patent like the Kellenberger Patent also relates to absorbent articles containing superabsorbent material.  Melius advances the technology of Kellenberger by increasing the concentration of superabsorbent within the absorbent composite.  In addition, Melius discloses a method and procedure for evaluating superabsorbent materials.

### 1.  "having/has"

Like they did for similar claim terms found in the Kellenberger Patent, defendants ask that we construe "having/has", found in claims 16, 18, 19, 64, 65, 69, 71, 73, 74, 78, 79, 83, 84, and 88 to mean "[t]he superabsorbent material is specifically selected based on its having the claimed properties."  (doc. 168 at pg. 51.)  KC again

argues that "has" should be given its common usage definition.  We once again agree with KC's construction of the claim term.

As we stated in our discussion of the Kellenberger Patent, First Quality by seeking to construe "has" to mean "selected"  improperly seeks to add a process limitation into an apparatus claim.  Likewise, First Quality's argument that KC disavowed the ordinary meaning of "has" in its filings with the PTO is not supported by the prosecution history.  "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim."  *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).  Here, we simply find no evidence that KC unambiguously disavowed the ordinary meaning of "has".  The portions of the prosecution history offered by First Quality as evidence indicate not that KC intended to disavow the ordinary meaning of "has", but rather show that the claimed invention had specific superabsorbent properties that KC believed offered a unique combination that would improve performance.  There is simply no intrinsic support for defendants' assertions.  Based on this reasoning, we conclude that "has" will be given its ordinary meaning.  Thus, we will construe "has" to mean  "possesses".

2.  "Vortex Time"

First Quality and KC dispute the term "Vortex Time" found in claims 69 and 78 of the Melius Patent.  First Quality contends the term is indefinite pursuant to 35 U.S.C. § 112.  (doc. 168 at pg. 58.)  KC argues that "Vortex Time" is expressly defined in the specification, and thus is not insolubly ambiguous.  (doc. 150 at pg. 78.)  After review, we agree with KC.

The specification provides, in relevant part, that "Vortex Time" is "the amount of time in seconds required for 2 grams of a superabsorbent material to close a

vortex created by stirring 50 milliliters of saline solution at 600 revolutions per minute on a magnetic stir plate." U.S. Patent No. 5,601,542, col. 15, ll. 33-36. The specification further provides for a "Vortex Time" testing procedure. This procedure involves measuring out 2 grams of a superabsorbent material and adding the material to a stirring saline solution. U.S. Patent No. 5,601,542, col. 16, ll. 6-16. While the solution is stirring, a person of skill in the art will "pour the superabsorbent material to be tested into the saline solution and start the stopwatch." U.S. Patent No. 5,601,542, col. 16, ll. 13-15. The specification dictates to "[s]top the stopwatch when the surface of the saline solution becomes flat and record the time." U.S. Patent No. 5,601,542, col. 16, ll. 18-19. The recorded time, in seconds, is the "Vortex Time". U.S. Patent No. 5,601,542, col. 16, ll. 18-19.

   First Quality essentially seeks summary judgment of invalidity based on indefiniteness. However, First Quality's assertion that "Vortex Time" is ambiguous or subjective is not supported by the intrinsic evidence. The claim language and specification teach a construction for "Vortex Time". This is a situation where the patent explicitly provides for a special definition of a claim term. The specification, as indicated above, unambiguously defines "Vortex Time" to mean "the amount of time in seconds required for 2 grams of a superabsorbent material to close a vortex created by stirring 50 milliliters of saline solution at 600 revolutions per minute on a magnetic stir plate." U.S. Patent No. 5,601,542, col. 15, ll. 33-36. Furthermore, the specification provides a protocol whereby a person of ordinary skill in the art can obtain a Vortex Time for any superabsorbent material. Contrary to First Quality's assertions of subjectivity on when a person skilled in the art would start the stopwatch, the procedure found in the specification provides that one "pour[s] the superabsorbent material to be tested into the saline solution and start[s] the stopwatch." U.S. Patent No. 5,601,542, col. 16, ll. 13-15.

19

By use of the conjunction "and", this language shows that the pouring of the material into the beaker and starting of the stopwatch are to occur contemporaneously.  Thus, we find First Quality's subjectivity argument unavailing.  Likewise, First Quality's contention that the Melius Patent fails to provide a way to determine when the vortex actually closes is rebutted by the specification, which provides that the vortex closes when "the surface of the saline solution becomes flat".  *See* U.S. Patent No. 5,601,542, col. 16, ll. 18-19.  Thus, based on the foregoing, we conclude "Vortex Time" is not insolubly ambiguous or subjective.  We will therefore construe it as indicated above and deny First Quality's request to hold this claim term indefinite.

IV.        *Conclusion*

         We will construe the disputed claim terms as set forth by the preceding memorandum.  We will issue an appropriate order.

                              /s/William W. Caldwell
                              William W. Caldwell
                              United States District Judge

Date: September 30, 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIMBERLY-CLARK WORLDWIDE, INC.,   :

        Plaintiff                :

        vs.                 :  CIVIL NO. 1:CV-09-1685

                        :

FIRST QUALITY BABY PRODUCTS, LLC,
FIRST QUALITY PRODUCTS, INC.,    :
FIRST QUALITY RETAIL SERVICES, LLC,
FIRST QUALITY HYGIENIC, INC.,     :
        Defendants and
        Counterclaim Plaintiffs    :

        vs.                 :

KIMBERLY-CLARK CORPORATION,   :
KIMBERLY-CLARK WORLDWIDE, INC.,
KIMBERLY-CLARK GLOBAL SALES, LLC,:
        Counterclaim Defendants

*O R D E R*

AND NOW, this 30th day of September, 2010, upon consideration of the

parties claim construction contentions, and pursuant to the accompanying Memorandum,

it is ordered that:

    1.  For the Ungpiyakul Patent, "backsheet layer" means "a layer of substantially liquid impermeable material."

    2.  For the Ungpiyakul Patent,  "a relatively smaller patch of web material" means "a piece of material that is at least somewhat smaller than the backsheet layer."

    3.  For the Christoffel Patent, "a demarcation line" means "a transverse fold line positioned off the absorbent core."

    4.  For the Christoffel Patent, "an absorbent core" means "a portion of the absorbent article containing a liquid permeable cover, a liquid permeable baffle, and an absorbent layer therebetween."

5.  For the Rajala Patents, "garment blank subassembly" means "a precursor of the garment."

6.  For the Rajala Patents, "first layer" and "second layer" mean "first operative layer" and "second layer," respectively.

7.  For the Rajala Patents, "a...section of...elastic across the crotch" and "extensible across the crotch" mean "a...section of...elastic across the crotch" and "extensible across the crotch," respectively.

8.  For Rajala Patent No. 5,940,887, "intersect" means "cross over or overlapping."

9.  For the Kellengber Patent, "can" and "has" mean "capable of" and "possesses," respectively.

10.  For the Melius Patent, "has" means "possesses."

11.  For the Melius Patent, "Vortex Time" means "the amount of time in seconds required for 2 grams of a superabsorbent material to close a vortex created by stirring 50 milliliters of saline solution at 600 revolutions per minute on a magnetic stir plate."


/s/William W. Caldwell
William W. Caldwell
United States District Judge

2